# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| TALKISP CORPORATION,<br><br>    Plaintiff,<br><br>vs.<br><br>XCAST LABORATORIES, INC., et al.,<br><br>    Defendants. | No. C05-0055<br><br>**REPORT AND RECOMMENDATION** |

_____

This matter comes before the court pursuant to plaintiff's March 14, 2005, application for a preliminary injunction (docket number 4). Hearing on this motion was deferred until the defendants' motion to dismiss on jurisdictional grounds was resolved. The motion for a preliminary injunction was referred to the undersigned United States Magistrate Judge for the issuance of a report and recommendation. The court held an evidentiary hearing on this motion on August 29, 30, and 31, 2005, at which the plaintiff was represented by Michael Dee and Adam Jones. The defendants were represented by Andrea Okun and Glenn Johnson. It is recommended that the application for a preliminary injunction be granted.

## NATURE OF THE CASE

The predominate issue in this case centers around the authorship of computer source code used in the telecommunication industry.[1] Plaintiff's motion requests an injunction ordering that the defendants provide plaintiff with a copy of the source code for plaintiff's

---

[1] According to plaintiff's brief, a source code is a series of statements, some written in a computer program language and others in normal text describing the intended function of the code. Source code is compiled by a computer and typically serves as the basis for a software program. See plaintiff's brief, p. 2.

web-based branch exchange telephone answering and call-transferring system ("UniMessaging"). In support of its motion, plaintiff claims that it is a "joint owner" of the source code under The Copyright Act of 1976 as the parties developed the source code together with the intention to merge their contributions into a unitary whole. Alternatively, plaintiff relies on an implied nonexclusive license theory, arguing that the defendants created the source code with the knowledge and intent that it would be used by plaintiff in its UniMessaging product. Plaintiff claims that it will suffer immediate and irreparable harm if defendants are not ordered to turn over a copy of the source code, and that the balance of hardships weighs in favor of an injunction.

Defendants resist plaintiff's motion, arguing that plaintiff has no colorable claim of ownership of the source code under copyright law.[2] Defendants further contend that an injunction is not warranted because any alleged harms claimed by the plaintiff are fully compensable by money damages and of plaintiff's own making as plaintiff rejected defendants' offers to support to support the technology for plaintiff in exchange for payment, and to license the software to plaintiff to enable plaintiff to support its customers. The court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

TalkISP is a corporation owned and operated by Kha Phan in Anamosa, Iowa. Kha Phan is a 37-year-old entrepreneur with a marketing degree from Iowa State University, earned in 1994. Prior to founding TalkISP, Mr. Phan co-founded a company called CoolCall.com. He has worked exclusively in the area of telecommunications and served as the director of sales and marketing for J.M. Best Communications.

---

[2] Plaintiff also argued exclusive ownership of the source code as a "works made for hire" under 17 U.S.C. § 201(b) in its brief in support of its motion, but stated at the hearing that it was no longer arguing that the individual defendants were its employees.

XCast Laboratories, Inc. is a Chicago based consultant and software development company for the telecommunications industry. It was founded by defendant Vladimir Smelyansky. Smelyansky or "Vlad" holds a master's degree in mathematics and computer science from Kiev State University in the Ukraine. He has an impressive technical background and has worked on the development of sophisticated hardware and software solutions for the telecommunications industry.

The UniMessaging product at issue in this case is designed to handle an organization's telecommunications needs. The primary system deployed in most organizations to handle communication devices, such as telephones and facsimiles, is called a private branch exchange (" PBX"). The function of a PBX is to permit convenient internal calling between system users and to provide a method for placing and receiving calls with outside telephone lines. A PBX is also the device that permits many users to share a relatively small number of telephone lines. Perhaps the most distinctive feature in the UniMessaging product at issue in this case is the ability of the system to forward calls as necessary to find the intended recipient whether that person be at home, at the office, on a pager, or cellular telephone. The system also provides for the telephone "trees" that most Americans have come to dislike, i.e., If you are calling for sales, please press 1; if you are calling for billing assistance, please press 2; etc.

Another important feature of this PBX System is the process of converting a traditional analog telephone signal to a digital signal for transmission over the Internet, called Voice Over the Internet or VoIP. This technology can be used to dramatically reduce the cost of long distance telephone calls.

Traditional telephone networks were known as a Public Switch Telephone Network ("PSTN'). VoIP is the alternative to PSTN in that the analog telephone signal is switched to digital for transmission over the Internet. An SIP (Session Initiation Protocol) is used as part of the process of converting analog voice transmissions into data. The SIP can be either a hardware device or a software application. Mr. Smelyansky developed his own

software-based SIP for integration into this system. The entire PBX system that is the subject of this lawsuit was developed from 2001 through 2005 and includes a SIP messaging processor, database layer, SIP agent application, media streams processor, Telephone User Interface, web interface, billing system, and ACD system. See Stipulation filed herein.

The web interface is also an integral part of the UniMessaging system. This product is web-based, meaning that the user of these telephone systems can program the system and features for particular phones by accessing menus on an Internet website. This feature obviously makes the system more flexible and user friendly.

Vladimir Smelyansky and the other individual defendants were working for a company called Webley. Webley developed products for the telecommunications industry. Due to a disagreement concerning the direction that Webley should take in the future, its principals had a falling out and Smelyansky and the other individual defendants were unemployed. They began developing their own web-based PBX system with the features identified above. They worked on their PBX system at home, over lunch hours at work, on weekends and at night. Smelyansky formed XCast Laboratories as a corporate shell under which the individuals could perform their work. The company was thinly capitalized and its value was derived solely from the efforts of the individuals who wrote computer source code.

In the spring of 2000 Phan and Smelyansky were introduced by acquaintenances in the telecommunications industry. They exchanged a number of email messages and telephone calls over the summer of 2002. By late summer 2002 it was clear that the two would soon work closely together. Together, they built a successful and valuable product. However, in 2004 they had a serious disagreement over merger talks with other entities. Mr. Smelyansky took the source code and will not permit TALKISP to have any access to the source code.

4

The issue in this case is whether TALKISP has the right to possess the source code for the UniMessaging system throughout the pendency of this case. While the technology associated with this product is very complex, several things were overwhelmingly demonstrated by the plaintiff at the hearing. It is these things that demonstrate the plaintiff's entitlement to the source code.

First, at the time that Kha Phan began his discussions with Vladimir Smelyansky, it is clear that Smelyansky and his associates had devoted a great deal of time to this product. It is also clear that the product was not complete and needed important creative input from Phan. After Phan became associated with the product, he became the driving force for the completion of the project. Specifically, while Smelyansky knew much more about writing source code, Phan knew what was necessary in order to complete and market the product. In this regard, Phan created the web interface. See Exhibit 8.

The interface is far less complex and much less difficult to create than the source code. The web interface was created with the use of a user-friendly product, but still possessed more than minimal creativity on the part of Kha Phan.[3] The voice prompts for the telephone system were contributed by Phan's wife. Finally, the user manual (Plaintiff's Exhibit 16) was created, but not finished, by Kha Phan. That user manual bears the copyright of TALKISP.

Second, from the first month that Mr. Smelyansky was introduced to Mr. Phan, Mr. Smelyansky represented himself as the agent of TALKISP. One of the first things he did was to suggest that he be given a TALKISP email address and use the title "Chief Technology Officer" or "CTO" when dealing with people outside the company. See Exhibit 4. Promotional materials described Smelyansky's skills and identified him as the CTO of TALKISP. See Exhibit 11. Throughout all of his dealings with potential licensees and a potential merger partner, Smelyansky consistently represented himself as CTO of

---

[3]Mr. Smelyansky also uses user-friendly products to assist in drafting his source code.

TALKISP and never held himself out as an agent of XCast Laboratories. At the hearing, Mr. Smelyansky claimed that he did this as a favor to Kha Phan. The contemporaneous documentation does not support this claim.

Third, the intellectual property of TALKISP was used in the creation of the UniMessaging product. The name UniMessaging was developed by Kha Phan. Phan secured all of the domain names associated with the term "UniMessaging." See Exhibit 2. All documentation sent to outsiders was done under the name TALKISP and many of the documents bear TALKISP's copyright marks.

Fourth, the receipt and distribution of revenue also demonstrates that the parties intended that TALKISP would own and license the software. Smelyansky and his associates devoted countless hours to the development of the product. Kha Phan also worked hard on the product and invested approximately $75,000 of TALKISP money into the project. While the money was not paid to Smelyansky and the others as employee wages, the money went directly to the individuals and not through XCast Laboratories. One of Smelyansky's associates was hired by TALKISP on October 28, 2003, as an employee to work in the area of service and support. See Exhibit 15. The very few checks that were ever paid to XCast Laboratories were simply cashed by Vladimir Smelyansky and kept for himself.

Fifth, when the product was finally licensed to customers, the license agreement clearly showed that TALKISP was the licensor of the technologies. See Exhibit 17. Furthermore, the form agreement has a provision stating that, in the event of TALKISP's insolvency, TALKISP agrees to give the source code to the licensee so that the software could be serviced. Vladimir Smelyansky admits that he was aware of these provisions in the license agreement and seems to have no response to it other than to say that because TALKISP is not currently insolvent, the insolvency provision is not currently at issue. However, the point is that in addition to bearing TALKISP's copyright, its domain names and the representation to third parties that TALKISP owned the right to license the

software, the product was never licensed as an XCast Lab's product. Mr. Smelyansky put himself into a position where it is now very difficult for him to claim that TALKISP does not have ownership rights in this product.

Finally, Mr. Smelyansky himself signed a service contract binding TALKISP on March 25, 2004, and a potential merger discussion in a memorandum dated June 22, 2004. See Exhibits 20 and 26, respectively.

## CONCLUSIONS OF LAW
### I. PRELIMINARY INJUNCTIONS

Applications for preliminary injunctions generally are measured against the standards set forth in Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109 (8th Cir. 1981) (en banc). See Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367, 368 (8th Cir. 1991) (noting that the district court "considered the [Dataphase] factors governing preliminary relief in the Eighth Circuit" when ruling on the request for a preliminary injunction); S.B. McLaughlin & Co., Ltd. v. Tudor Oaks Condo. Project, 877 F.2d 707, 708 (8th Cir. 1989) (same).

The Dataphase factors include: (1) the likelihood of success on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested partes; and (4) whether the grant of a preliminary injunction is in the public interest. Dataphase Sys., Inc., 640 F.2d at 114; Medicine Shoppe, Int'l, Inc. v. S.B.S. Pill Dr., Inc., 336 F.3d 801, 803 (8th Cir. 2003) (listing Dataphase factors. No one factor is determinative; rather, in each case all of the factors must be balanced to determine if they tilt toward or away from granting a preliminary injunction. West Pub. Co. v. Mead Data Cent., Inc., 799 F.2d 1219, 1222 (8th Cir. 1986). The moving party bears the burden on all four factors. Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987). See also Adam-Mellang v. Apartment Search, Inc., 96 F.3d 297, 299 (8th Cir. 1996) (noting that the moving party

7

must establish a sufficient threat of irreparable harm); Baker Elec. Co-Op., Inc. v. Chaske, 28 F.3d 1466, 1472 (8th Cir. 1994) (noting that the party moving for preliminary injunctive relief has the burden of establishing entitlement to such relief); Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999) (same).

## II. ANALYSIS OF THE DATAPHASE FACTORS

### A. Likelihood of Success on the Merits

In analyzing plaintiff's likelihood of success on the merits of its claims, the inquiry is not whether the plaintiff, as the moving party, will ultimately succeed, but rather must be "at least . . . sufficiently likely to support the kind of relief it requests." Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co., 997 F.2d 484, 488 (8th Cir. 1993); Glenwood Bridge, Inc., 940 F.2d at 371. Thus, a showing of likelihood of success on the merits requires only that the plaintiff find support for its position in the governing law. Baker Elec. Co-Op., Inc., 28 F.3d at 1473-74.

#### 1. Joint Ownership

The Copyright Act of 1976 defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. See also Community for Creative Non-Violence v. Reid, 490 U.S. 730, 753 (1989) (finding that the association who commissioned a sculpture may be a joint author of the sculpture if the association and the sculptor prepared the work "with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." "The authors of a joint work are coowners of copyright in the work." 17 U.S.C. § 201(a). "In a joint work, the joint authors hold undivided interests in a work, despite any differences in each author's contribution," including the right to "use or to license the use of the work, subject to an accounting to the other co-owners for any profits." Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1068 (7th Cir. 1994) (citing Childress v. Taylor, 945 F.2d 500, 505 (2d Cir. 1991); Weinstein v. University of Illinois, 811 F.2d 1091, 1095 (7th Cir. 1987);

8

1 Nimmer on Copyright, § 6.02 at 6-7 to 6-8). "Thus, even a person whose contribution is relatively minor, if accorded joint authorship status, enjoys a significant benefit." Id.

In attempting to define the criteria for determining "joint authorship," the committee reports state that "a work is 'joint' if the authors collaborated with each other, or if each of the authors prepared his or her contribution with the knowledge and intention that it would be merged with the contributions of other authors as 'inseparable or interdependent parts of a unitary whole.' The touchstone here is the intention, at the time the writing is done, that the parts be absorbed or combined into an integrated unit." Id. (quoting House Report at 120; Senate Report at 103; U.S. Code Cong. & Admin. News 1976, pp. 5763). "The statute clearly requires a focus on the intention to collaborate." Id. Moreover, each author's contribution must be "represent[] original expression that could stand on its own as the subject matter of copyright." Id. (citing Paul Goldstein, Copyright: Principles, Law, and Practice § 4.2.1.2, at 379 (1989))[4].

To qualify for "author" status, one must supply more than mere ideas or direction. Id. at 1071. "An author is the 'party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection.'" Id. (quoting Reid, 490 U.S. at 737). See also Ashton-Tate Corp. v. Ross, 916 F.2d 516, 521 (9th Cir. 1990) ("We held in Payday, that '[t]o be an author, one must supply more than mere direction or ideas; one must translate[] an idea into a fixed tangible expression entitled to copyright protection.'"). The act defines a work as "fixed" in a "tangible medium of expression when its embodiment in a copy or phonorecord, by or under the

---

[4] This court opts to follow the majority of other courts in adopting and applying Professor Goldstein's copyrightable subject matter test, i.e., each author's contribution must be copyrightable, over Professor Nimmer's de minimus test, which requires only that the combined product of joint efforts be copyrightable. See Id. at 1070-71 (citations omitted); Childress, 945 F.2d at 506-07 (citations omitted). "It seems more consistent with the spirit of copyright law to oblige all joint authors to make copyrightable contributions, leaving those with non-copyrightable contributions to protect their rights through contract." Id. at 507.

9

authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17 U.S.C. § 101.

With respect to the "inseparable" and "interdependent" requirements, "parts of a unitary whole are 'inseparable' when they have little or no independent meaning standing alone." Childress, 945 F.2d at 505. "[P]arts of a unitary whole are 'interdependent' when they have some meaning standing alone but achieve their primary significance because of their combined effect, as in the case of the words and music of a song." Id.

Plaintiff argues that the parties intended to merge their contributions into a unitary whole and that the UniMessaging product, as a whole, will not work if either party's contribution thereto had not been incorporated. Plaintiff contends that the defendants knew from the beginning that the ultimate purpose of the source code was to serve as the software component of the UniMessaging product and even admitted during a presentation that the entire source code belonged to the plaintiff. Thus, plaintiff claims, the defendants intended that their work would be merged with that of plaintiff and subsequently be owned exclusively by the plaintiff.

Defendants counter that they never intended to created joint ownership in the source code, and that defendant Xcast acted vigilantly to protect the individual defendants' rights in their intellectual property. Defendants further argue that there is no joint ownership because the plaintiff made no copyrightable contribution to the source code, which is required for joint authorship to exist. At most, defendants contend, plaintiff contributed ideas and technical work which was merely cosmetic and not necessary for the product to work as a whole.

Smelyansky and his peers had invested significant time and effort into developing the source code prior to Phan's involvement. It was Phan's involvement and efforts, however, that brought the product to fruition. The evidence is very convincing that the parties intended to contribute their respective expertise to the development of a "unitary

10

whole." Without the source code, there would be no UniMessaging product. Likewise, without the web interface, the source code would have been worthless in a commercial capacity. Phan's contributions, while not on the same technical difficulty level as Smelyansky's source code, are more than cosmetic as defendants argue, and are necessary for the product to work. Moreover, Smelyansky consistently represented himself to potential investors and others as an agent of TALKISP, and represented TALKISP as the owner of the technology, until he and Phan had a disagreement concerning the acquisition of TALKISP by another corporation.

In sum, the court finds that plaintiff has demonstrated support for its argument that it is a joint owner under The Copyright Act of 1976, and is likely to succeed on the merits of its copyright claim. This Dataphase factor weighs in favor of injunctive relief.

### 2. Implied License

Section 204(a) of the Copyright Act of 1976 provides that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). Section 101 of the act defines "transfer of copyright ownership" as an "assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or any other of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license." 17 U.S.C. § 101. Thus, while the Copyright Act requires that exclusive licenses be evidenced by a writing requirement, and nonexclusive licenses may be granted orally, or may even be implied from conduct. Lulirama Ltd., Inc. v. Axcess Broadcast Servs., Inc., 128 F.3d 872, 879 (5th Cir. 1997). Rather than transfer ownership of the copyright to the licensee, an implied nonexclusive license simply permits the use of a copyrighted work in a particular manner. I.A.E., Inc. v. Shaver, 74 F.3d 768, 775 (7th Cir. 1996).

The Ninth Circuit Court of Appeals found that an implied nonexclusive license had been granted when (1) the licensee requests the creation of a work, (2) the licensor makes the particular work and delivers it to the licensee, and (3) the licensor intends that the licensee copy and distribute his work. Effects Assoc., Inc. v. Cohen, 908 F.2d 555, 558-59 (9th Cir. 1990). See also I.A.E., 74 F.3d at 777 (finding an implied nonexclusive license where the architect delivered his copyrighted designs to the airport without any warning that their further use would constitute copyright infringement, acknowledged in writing that he was no longer a contributor to the airport project, but that he expected "that our ideas and knowledge exhibited in our work will assist the Airport in realizing a credible and flexible use Cargo/Hangar facility").

Regarding the termination of transfers and licenses granted by authors, section 203 of the Copyright Act provides, in pertinent part:

> **(a) Conditions for Termination.** - In the case of any work other than a work made for hire, the exclusive or nonexclusive grant of a transfer or license of copyright . . . is subject to termination under the following conditions:
>
> **(3)** Termination of the grant may be effected at any time during a period of five years beginning at the end of thirty-five years from the date of execution of the grant . . .
>
> **(4)** The termination shall be effected by serving an advance notice in writing, signed by the number and proportion of owners of termination interests required under clauses (1) and (2) of this subsection, or by their duly authorized agents, upon the grantee or the grantee's successor in title.
>
>> **(A)** The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date

> of the termination, as a condition to its taking effect.
>
> **(B)** The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.
>
> **(6)** Unless and until termination is effected under this section, the grant, if it does not provide otherwise, continues in effect for the term of copyright provided by this title.

17 U.S.C. § 203.

A nonexclusive license may be irrevocable if supported by consideration, as a nonexclusive license supported by consideration is a contract and a "party's unilateral right of rescission without notice is entirely inconsistent with the existence of a contract between the parties." I.A.E., 74 F.3d at 882 (citations omitted). If the licensor had the ability to terminate the license at will, then no contract could exist because the licensor's contractual obligation would be illusory and a "presumption exists that parties to a purported contract did not intend to make illusory promises." Id. at 882, 883. But see Walthal v. Rusk, 172 F.3d 481, 484-85 (7th Cir. 1999) (holding that section 203 of the Copyright Act does not set forth a minimum license period and thus, does not require an author to wait 35 years before terminating the agreement, assuming termination is permitted by agreement or state law, even if no termination date is specified in the agreement).

Plaintiff argues that it is entitled to the source code under an implied nonexclusive license theory as the hiring party that expended considerable resources and divulged proprietary information in order to have the source code developed, and the defendants created the source code with the knowledge and intent that it would be used by plaintiff as part of its UniMessaging product.

Defendants counter that the existence of an implied license is irrelevant because they have terminated any license that may have existed. Defendants further argue that any

implied license held by the plaintiff was limited in scope to distribute the source code only, not ownership.

The court finds that the plaintiff's implied licence theory is supported by applicable law as an alternate means of recovery. The defendants' conduct in writing the source code demonstrate that it was developed with the knowledge and intent to be used by the plaintiff as part of its UniMessaging product. Moreover, the court is unconvinced that the defendants have terminated any license that may have existed, or that the license was limited in scope to distribution only. There has been no writing produced evidencing a termination, as required by 17 U.S.C. § 203(a)(4). The parties' actions, taken as a whole, do not support defendants' argument that plaintiff was to be a mere distributor. Plaintiff's likelihood of success on the merits of this claim weighs in favor of the requested injunction.

B.    Threat of Irreparable Harm to the Plaintiff

Irreparable harm may be established by showing that the moving party has no adequate remedy at law. Baker Elec. Co-Op., 28 F.3d at 1473; Frank B. Hall & Co. v. Alexander & Alexander, Inc., 974 F.2d 1020, 1025 (8th Cir. 1992). However, a valid monetary damage claim does not automatically preclude the issuance of injunctive relief, however, as money damages may not fully compensate a moving party for intangible injuries, such as injury to goodwill and business relationships with customers. Moore Bus. Forms, Inc. v. Wilson, 953 F. Supp. 1056, 1062 (N. D. Iowa), aff'd, 105 F.3d 663 (8th Cir. 1996).

Without the source code, plaintiff argues, it is unable to service its PBX System customers and fulfill its various contractual obligations. Thus, plaintiff claims that its customer loyalty is at risk, as is its reputation in the industry, goodwill, and product value.

Defendants contend that the plaintiffs cannot show irreparable harm as plaintiff's alleged harms are easily compensated by money damages. Furthermore, defendants argue, any harm suffered by the plaintiff are of its own making because it rejected defendants'

offer to continue to support plaintiff's customers and technology, as well as defendants' offers to enter into agreements to allow plaintiff to continue to act as a reseller of the system, and to discuss the possibility of a "field of use" license, which would have given the plaintiff access to the source code for purposes of supporting its customers and selling the product - with licensing fees payable to the defendants.

The prevailing view is that a "showing of a prima facie case of copyright infringement or reasonable likelihood of success on the merits raises a presumption of irreparable harm." Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1254 (3d Cir. 1983) (citations omitted). "A copyright plaintiff who makes out a prima facie case of infringement is entitled to a preliminary injunction without a detailed showing of irreparable harm." Id.

As set forth above, the court finds that there is a reasonable likelihood of success that the plaintiff will succeed on the merits of its copyright claim. Thus, the presumption of irreparable harm arises. Notwithstanding this presumption, the court further finds that the plaintiff expended substantial sums of money in developing the UniMessaging product, including the source code, and that the risk to its customer relations and competitive position satisfy the irreparable harm requirement. Id. ("[T]he public interest underlying the copyright law requires a presumption of irreparable harm, as long as there is, as here, adequate evidence of the expenditure of significant time, effort and money directed to the production of the copyrighted material. Otherwise, the rationale for protecting copyright, that of encouraging creativity, would be undermined."). The court is not persuaded by the defendants' argument that the plaintiff's harm is of its own making by declining to enter into support, resale, and/or "field of use" licensing agreements, all of which would have cost the plaintiff even more money and required that the plaintiff renounce any ownership rights in the technology. The court concludes that the "irreparable harm" factor weighs in favor of the injunction.

15

C. Balance of Harms

In considering this factor, the court must "balance between the harm [to the movant] and the injury that the injunction's issuance would inflict on other interested parties, and the public interest." Pottgen v. Missouri State High Sch. Activities Ass'n, 40 F.3d 926, 929 (8th Cir. 1994).

Plaintiff argues that the balance of harms weighs in favor of an injunction as it is facing immediate and irreparable harm to its business, reputation, goodwill, and early market entry. Plaintiff contends that the harm to defendant would not be harmed by being ordered to turn over a copy of the source code because the defendants expended no monetary resources in developing the source code.

Defendants contend that it would face far greater harm in turning over the source code as Global Touch's major selling point in seeking and attaining investors and customers was its complete ownership of the PBX System and its source code.[5] The value of Global Touch would be devalued by as much as 75% if it were forced to share the source code, its biggest resource and asset.

Gregory Welch, President and CEO of Global Touch, testified at the hearing that Global Touch was aware that the ownership of the source code was in dispute at the time Global Touch acquired XCast. Therefore, the court finds specious Global Touch's purported reliance on its complete ownership of the PBX system, including the source code, as its major selling point in seeking and obtaining investors and customers. As previously determined, the presumption of irreparable harm, coupled with the financial expenditure on plaintiff's part, and the jeopardy plaintiff faces with respect to its

---

[5] Global Touch is the company that sought to acquire TALKISP in 2004. The merger talks involving Global Touch, Phan, and Smelyansky ended in a serious disagreement between Phan and Smelyansky. Ultimately, TALKISP was not acquired by Global Touch, but Global Touch did acquire XCast Labs.

reputation, good will, and early market entry leads the court to conclude that the balance of harms weighs in favor of an injunction.

D. The Public Interest

The final Dataphase factor to be considered is whether the public interest would be served by issuance of the injunction. In this case the inquiry is whether public interest favors ordering the defendants to provide a copy of the source code to the plaintiffs, either as joint owners or pursuant to an implied license under The Copyright Act of 1976.

Plaintiff argues that the public interest weighs heavily in favor of an injunction because, without the source code, it cannot service its customers, market its PBX System, and the defendants will monopolize the market with respect to this technology, which it inappropriately achieved. Defendants contend that the public interest would best be served by strictly upholding the copyright laws and protecting their copyright rights.

"Since Congress has elected to grant certain exclusive rights to the owner of a copyright in a protected work, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work." Klitzner Indus., Inc. v. H.K. James & Co., 535 F. Supp. 1249, 1259-60 (E.D. Pa. 1982). See also Apple Computer, Inc., 714 F.2d at 1254-55; Taylor Corp. v. Four Seasons Greetings, LLC, 403 F.3d 958, 968 (8th Cir. 2005). As the court has found that plaintiff is reasonably likely to succeed on its copyright claims, the court likewise finds that the public interest would best be served by protecting plaintiff's copyright interests by means of the injunction requested.

III. CONCLUSION

As set forth above, the court finds that the plaintiff is likely to succeed on its copyright claims against the defendants, and that the other Dataphase factors weigh in favor of an injunction. Plaintiff expended substantial sums of money in its venture to

develop its UniMessaging PBX product, including the source code written by the defendants, and the court is convinced that the plaintiff faces irreparable harm if it is not given a copy of the source code so it can troubleshoot problems and service its customers. Moreover, the court finds that the balance of harms does weigh in plaintiff's favor, and that the public interest would be best served by entering the injunction requested by the plaintiff.

## IV. BOND

Should plaintiff's request for injunctive relief be granted, defendants request that plaintiffs be required to post a bond, pursuant to Fed. R. Civ. P. 65(c), of no less than $5,000,000.00.

Fed. R. Civ. P. 65(c), provides, in pertinent part:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

The court finds that bond in the amount of $ 10,000.00 is sufficient to protect defendants' interests should it ultimately be determined that this injunction was improvidently granted.

For the reasons discussed above, **IT IS RECOMMENDED**, unless any party files objections[6] to the Report and Recommendation within ten (10) days of the date of the Report and Recommendation, that plaintiff's motion for preliminary injunction (docket number 4) be granted and that defendants be required to produce to plaintiff a complete

---

[6]Any party who objects to this report and recommendation must serve and file specific, written objections within ten (10) court days from this date. A party objecting to the report and recommendation must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections.

and unadulterated copy of the source code for the UniMessaging PBX system as it existed as of December 31, 2004. The court further recommends that bond pursuant to Rule 65(c) be set at $10,000.00.

December 19, 2005.

_____
JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT